THE PEOPLE, Plaintiff and Respondent, v. EDDIE LEE HUNTER et al., Defendants and Appellants.

Elinor Chandler, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip M. Rosten, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal by each of the named defendants from a judgment of conviction of two counts of robbery.

In an information filed in Los Angeles County on April 28, 1965, defendants were jointly charged in count I with robbing Ronnie Levine of certain suits of clothes of the value of $7,230 and of $115 in money on or about February 23, 1965, and further it was charged that at the time of the commission of the crime the defendants were armed with a deadly weapon, namely, a sawed-off shotgun; in count II with robbing Harry Schwartz of about $125 in money on or about February 23, 1965, and, further, it was charged that at the time of the commission of the crime the defendants were armed with a deadly weapon, namely, a sawed-off shotgun. Defendants, while represented by counsel of their choosing, pleaded not guilty. A jury trial was duly waived. After a court trial conducted on August 10, 11, and 12, 1965, each of said defendants was found guilty of robbery in the first degree and it was found further that defendants were armed at the time of the commission of the crimes. Each of the defendants was sentenced to the state prison, the sentences on each count to run concurrently with each other.

A résumé of some of the facts is as follows: At about 12:30 p.m. on February 23, 1965, James Turner appeared at the Levine store with a firearm in his hand. He directed everybody to lie on the floor and thereafter he removed almost $90 from Mr. Levine's wallet and about $125 from the person of Harry Schwartz.

Eddie Lee Hunter entered the front door of the store and placed a gun at the side of Patricia Parri and directed her to the floor. Another person came into that particular part of the store and said, "I've taken care of them. You get the rest of them." Ernestine White, an employee of the store, saw Hunter enter a department of the store and Hunter directed her to open the cash register from which Hunter took an undisclosed amount of money. Hunter kicked Miss White while she lay on the floor pursuant to directions.

Levine, while on the floor, heard two persons running back

and forth between the suit racks and the front entrance while Turner stood guard. Later, Levine got up and found that about 200 suits, valued at $7,000, were missing.

On April 2, 1965, Ernest Perkins was arrested for another robbery. Perkins told Officer Mockett, of the Los Angeles Police Department, that he knew of three persons involved in the robbery at Levine's Clothing Store, naming them as Andy Wood, Eddie Hunter, and "Blue" Turner, and, further, told the officer that Hunter lived in the same apartment as a Johnny Williams on East 87th Place. Perkins did not know the number of the apartment or the address, but did say that it was an upstairs apartment facing the street and, further, that Turner had an apartment in the area of 80th and Normandy Streets. Officer Mockett, after receiving this information, went to the station with Officer Mejia and another officer, checked records and learned that Williams lived with a man named Andrew Wood at 815 West 87th Street. With Sergeant Clark, the three officers mentioned went to the last-named address at about five o'clock in the afternoon where they went to the front upstairs apartment which Perkins had mentioned (hereafter referred to as apartment "4"). Officer Mejia knocked on the door and a person whom Officer Mockett recognized, and later determined, to be Hunter came to a window immediately to the left of the door. Hunter moved the drapes, looked out of the window and immediately closed the drapes. The officers then heard footsteps going away from the window and Officer Mejia identified himself as an officer and called out, "I'd like to talk to you." There was no response to the call and Officer Mejia again identified himself as a policeman and knocked on the door and again received no reply. Almost at the same time the door to the apartment across the hallway opened (hereafter referred to as apartment "3") and Officer Mejia saw Wood. Wood immediately slammed the door shut and Sergeant Clark heard a chain lock being applied from the inside of apartment "3." Officer Mejia knocked on the door of apartment "3" and identified himself as a policeman. There was no response, but a great deal of commotion could be heard coming from the inside of said apartment.

Upon hearing the commotion, Sergeant Clark went downstairs where he could observe the east side of the building. While standing at that location he saw a bundle of clothing being pushed, or thrown, out of the rear window of apartment "3." He went up to the bundle and saw a brown shopping

bag which contained marijuana. After taking the suits and marijuana to the police car, Sergeant Clark proceeded to a point on the driveway and shouted to the officers upstairs, ''Go on in. I have six suits and some weed they just threw out of the bedroom window'.'

Officer Mejia, upon hearing this, proceeded to kick open the door to apartment ''3'' where he found Wood and three other men, and where he recovered many suits of clothes. Officer Mockett, upon hearing Sergeant Clark, forced open the door to apartment ''4'' and found two men inside. Officer Mockett asked where Hunter was and was told that Hunter had gone out the window when the officers knocked on the door. Officer Mockett found 35 suits of clothes, 7 sports jackets, 14 pairs of pants and 3 sport coats in apartment ''4.'' Officer Mejia entered apartment ''4'' within a short time and asked one of the men there whether he knew a man named ''Blue.'' One of the men said that he did, and after verifying ''Blue's'' address with his wife he took the officers to 1423 West 80th Street.

Officer Mejia went to the maibox at the last named address and ascertained that a man named Turner lived in apartment ''2'' and while accompanied by a fellow officer at about 7 or 7:30 p.m., knocked on the door. Turner came to the door and opened it. Officer Mejia introduced and identified himself, looked at Turner and saw that Turner fitted the description of one of the suspects in the robberies and placed him under arrest. Officer Mejia then entered the apartment and Hunter, who came in from the hallway, was recognized by Officer Mejia and was arrested immediately. A search of the apartment was made and numerous suits of clothes, a large amount of money, and other materials were found.

At about 7:30 p.m. on April 2, 1965, on the night of the arrest, Officer Mockett advised Turner and Hunter that they had a right to an attorney, a right to remain silent and that anything they said could possibly be used against them in a criminal proceeding. Again on April 5, 1965, at about 9:30 a.m., Officer Mockett advised Hunter of his constitutional rights and Hunter gave a free and voluntary statement. Hunter told the officers that he would tell them what occurred in the robberies if they would bring his girl friend and his sister to him. After determining that the girl friend was in school, Officer Mockett contacted Hunter's sister, picked her up and brought her to the jail at about 1 p.m., where she talked with Hunter for about an hour. Officer

Mockett then took Hunter upstairs where Hunter gave an oral statement. Officer Mockett told Hunter that he had information from Perkins as to who had "pulled" the robbery and Hunter said, "Well, as long as you know about it, I might as well tell you," and then gave a statement.[1]

On April 6, 1965, Officer Mockett advised Wood of his constitutional rights and, further, that Hunter had made a statement. Wood stated that he wanted to talk with Hunter and following Hunter's telling Wood that he had made a statement, Wood stated that he, also, would like to make a statement and did so at about 9:50 a.m.[2]

On April 7, 1965, at about 9:45 a.m., Officer Mockett talked with Turner who previously had been advised of his constitutional rights. Officer Mockett told Turner that the police had statements from Hunter and Wood and showed the statements to Turner. Turner recognized the handwriting and said he also wanted to make a statement and did so.[3]

Defendants offered no defense at the trial other than that their confessions were not free and voluntary.

Appellants now assert that the arrest of Turner and Hunter was illegal, the identification of appellants in the police line-ups violated the equal protection clause of the Fourteenth Amendment of the United States Constitution, the confessions were obtained by trick and device and were in violation of the rules of *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361] and *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

█ The arrests of Hunter and Turner were legal and

[1] " 'We had planned to break in through the roof at night and we drove over to case the place. We saw someone fixing the roof, so we decided to get a gun and hold up the place.

" 'Blue Turner and I went in the front and threw the peace [piece] on the people. Wood had his pickup. We loaded the suits into it. I went with Wood in the pickup and Blue drove the old Chevy. We went to a vacant pad on 40th Street and split the stuff. I got $20 and 20 suits. The others got the same. Blue had the shotgun.' "

[2] " 'I had part in the Levine robber [sic] . . . robber [sic] on February 23, 1965. I drove my truck in the robber [sic] and helped load some clothes. I did not have a gun. . . . Turner and another guy went into Levine. First Turner had the shotgun. When I came in the people were laying down. We drove to 40th Street and Avalon Boulevard and Avalon and split the stuff. I got $20 and some of the suits, . . . [signed] Andrew D. Wood.' "

[3] " 'On the 23rd of Feb., I was involved in a clothing store robbery. I had a .22 on me. Eddie had the other gun.' . . . '. . . We just took some suits, $128. We went to 40th S. and A' . . . '—and Avalon to didvid [sic]' . . . 'it and I got about $22. I got about 22 or 23 suits and 23 or 24 out of it. Hunter was the brains behind the whole thing. James Turner.' "

proper. The information which Perkins had supplied the officers was corroborated in practically every respect. The officers used the information supplied to them to make an investigation. (See *People* v. *Mickelson,* 59 Cal.2d 448, 450-451 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Currier,* 232 Cal. App.2d 103, 106 [42 Cal.Rptr. 562].) When the investigation results corroborated Perkins' information, the officers were entitled to make an arrest. (See *People* v. *Reeves,* 61 Cal.2d 268, 273-274 [38 Cal.Rptr. 1, 391 P.2d 393].) The furtive and suspicious conduct with which the officers were confronted when they went to apartments "3" and "4" served to substantiate the information they had received from Perkins. (See *People* v. *Melchor,* 237 Cal.App.2d 685, 693 [47 Cal.Rptr. 235]; *People* v. *Currier, supra,* 232 Cal.App.2d 103.) However, when Sergeant Clark called out in effect that the persons inside of the apartment were throwing the loot out of the window, the officers would have been derelict in their duty had they not gone in and made the arrest and search. When once inside and having located considerable contraband or loot, they were told that Hunter had gone out the window ahead of them. The officers then properly proceeded to Turner's and located Hunter and Turner.

■ Hunter and Turner contend that they were denied equal protection of the law when they were placed in the police lineup for identification by the victims of the robbery. Their argument is that they had no money with which to get out on bail and therefore they were forced into the lineup, whereas if they had money they would have been out on bail and would have avoided the lineup. In the lineup, Mr. Levine and Miss Parri identified them as being two of the persons who committed the robbery in question. However, they also were identified at the trial by two other witnesses who had not viewed them in the lineup, and were at the trial independently identified by Levine and Miss Parri. This, coupled with the free and voluntary confessions, indicates that appellants would have been convicted in spite of any lineup. The Supreme Court said in *Schmerber* v. *California,* 384 U.S. 757, 763-764 [16 L.Ed.2d 908, 916-917, 86 S.Ct. 1826]:

■ "[T]he protection of the privilege reaches an accused's communications, whatever form they might take, . . . On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, *to appear in court, to stand,*

*to assume a stance, to walk,* or to make a particular gesture. The distinction which has emerged . . . is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it.'' (Italics added.) (See also *Rigney* v. *Hendrick,* 355 F.2d 710, 712; *Evans* v. *Hendrick,* 359 F.2d 776; *People* v. *Lopez,* 60 Cal.2d 223, 234 [32 Cal.Rptr. 424, 384 P.2d 16]; *People* v. *Parham,* 60 Cal.2d 378 [33 Cal.Rptr. 497, 384 P.2d 1001]; *People* v. *Juarcz,* 243 Cal.App.2d 475, 478 [52 Cal.Rptr. 556].)

True it is that under *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951] (decided June 12, 1967) and *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926] (decided June 12, 1967) the police perhaps should have advised each person who was to be in a lineup that he had a right to an attorney, and so forth, but under *Stovall* v. *Denno,* 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967] (decided June 12, 1967), the rules enunciated in *Wade* and *Gilbert, supra,* are to be applied prospectively. The court said in *Stovall, supra,* '' [w]e hold that *Wade* and *Gilbert* affect only those cases and all future cases which involve confrontations for identification purposes conducted in the absence of counsel after this date. . . .'' Further, the court said, ''We also conclude that, for these purposes, no distinction is justified between convictions now final, as in the instant case, and convictions at various stages of trial and direct review.''

The confessions of Wood and Hunter were properly taken and received into evidence. Their assertion or claim of ''trick and device'' because the officers showed them the confessions of their colleagues in crime ''to get [them] to confess'' is without merit. (See *People* v. *Ellis,* 206 Cal. 353, 360 [274 P. 353]; *People* v. *Siemsen,* 153 Cal. 387, 395 [95 P. 863].)

The trial in this case was started on August 10, 1965. *Miranda* v. *Arizona, supra,* 384 U.S. 436, was decided June 13, 1966. The rules set forth in *People* v. *Dorado, supra,* 62 Cal.2d 338 were complied with in every respect. The rules of *Miranda, supra,* are not applicable to this case.

There is no prejudicial error in the record in this case.

The judgments are, and each is, affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied September 7, 1967.